# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

RANCHERS CATTLEMEN ACTION
LEGAL FUND UNITED
STOCKGROWERS OF AMERICA,
TRACY and DONNA HUNT, d/b/a THE
MW CATTLE COMPANY, LLC, and
KENNY and ROXY FOX,

        Petitioners,

vs.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al,*

        Respondents.

Case No.  19-CV-205-F

---

## ORDER

The only claim remaining in this case is Petitioners' (collectively, "R-CALF") claim that Respondents (collectively "APHIS"[1]) violated the Administrative Procedure Act (APA).  More specifically, R-CALF alleges APHIS failed to comply with the Federal Advisory Committee Act (FACA) which constitutes arbitrary and capricious agency action in violation of the APA. CM/ECF Document (Doc.) 27, pp. 28-29.  A more focused statement of the issue presented is whether APHIS correctly determined that FACA did not apply to its work with the Cattle Traceability Working Group (CTWG) and the Producer

---

[1] APHIS refers to Animal and Plant Health Inspection Service of the U.S. Department of Agriculture.

Traceability Council (PTC). *See* Doc. 47, p. 2. This issue requires the Court to decide whether APHIS "established" or "utilized" these committees.

To aid in this determination, R-CALF seeks to complete the agency record with certain documents R-CALF received in response to a Freedom of Information Act (FOIA) request. Doc. 52, 62. R-CALF argues these documents are relevant to the FACA "established" and "utilized" issues. APHIS opposes completion based primarily on a merits argument as to the meaning of "established." The Court agrees with R-CALF that its proffered documents for completion of the record are relevant to R-CALF's argument as to the proper interpretation and application of "established" under FACA. For this reason, the Court grants R-CALF's motions to complete the agency record and will consider the documents supplied by R-CALF as part of the agency record. Doc. 52-1, 62-1, 62-2, 62-3, 62-4 & 62-5.

Background

On October 4, 2019, R-CALF filed a Petition for Review of Agency Action and Complaint for Declaratory Judgment and Injunctive Relief, challenging APHIS's issuance of a 2019 "Factsheet" entitled "Advanced Animal Disease Traceability: A Plan to Achieve Electronic Identification of Cattle and Bison." Doc. 1. R-CALF alleged the Factsheet unlawfully mandated the use of radio frequency identification (RFID) eartags and technology for certain categories of livestock. On October 25, 2019, APHIS posted a statement on its website announcing that it had removed the Factsheet from its website, "as it is no longer representative of current agency policy." (Doc. 11-3). This Court concluded

R-CALF's petition seeking relief from the Factsheet was moot, and dismissed the case for lack of jurisdiction. Doc. 21.

On R-CALF's Rule 60(a) motion, the Court granted leave for R-CALF to amend its FACA claim. Doc. 26. A timely amended complaint and petition was filed. Doc. 27. That filing led to a dispute concerning whether discovery on R-CALF's FACA claim would be permitted. By Order, this Court reaffirmed that the case would proceed under a record review rather than as a civil case where discovery is permitted. Doc. 46. The Order concluded that FACA affords no private cause of action. Thus, all FACA violation claims would proceed only under the judicial review provision of the APA. *Id.*

APHIS filed its administrative record on July 6, 2020 (Doc. 29), and supplemented the record on August 28, 2020. Doc. 39. By Order entered December 23, 2020, the Court allowed five extra-record documents submitted by R-CALF (Doc, 47-1, 47-2, 47-3, 47-4 and 47-6), to complete the agency record. Doc. 50. Consistent with this Order, the Court will also consider six additional documents supplied by R-CALF. Doc. 52-1, 62-1, 62-2, 62-3, 62-4 & 62-5. The agency record and R-CALF's extra-record documents show the following as to APHIS, the CTWG and the PTC relative to the issue of whether APHIS "established" or "utilized" these two entities:

1. In 2013, APHIS published a rule entitled "Traceability for Livestock Moving Interstate." AR 110. However, internal assessments by APHIS concluded that an electronic ID device (EID) was required for a truly effective Animal Disease Traceability (ADT) program. Administrative Record (AR) 112-114.

3

2. APHIS established a State-Federal ADT Working Group[2] in 2017 which provided recommendations to APHIS, including the recommendation that the United States "must move toward an EID system for cattle with a targeted implementation date of January 1, 2023." AR 124. The recommendation also recognized that a comprehensive plan would be necessary to "address the multitude of very complex issues related to the implementation of a fully integrated electronic system" and "[a] specialized industry-lead task force with government participation should develop the plan...." *Id.*

3. APHIS also acknowledged "we must achieve an industry-driven, pro-traceability position that supports [EID]." To achieve this strategic goal, "APHIS officials must meet with industry leaders frequently and focus discussion on critical issues, while moving forward with any changes to the current system in a transparent manner." AR 139. APHIS anticipated it would "provide a lead role in communicating the issues at stake" and "[e]ncourage formation of an industry-led task force with input from animal health officials as needed." *Id.*

4. In September 2017, a Strategy Forum on Livestock Traceability was held, funded in part and co-hosted by APHIS. Doc. 47-2, 47-4 at p. 3. Key recommendations from the State-Federal ADT Working Group were discussed, including the

---

[2] In the original pleading (Doc. 1), R-CALF alleged that APHIS's activities relating to the State-Federal Animal Disease Traceability Working Group violated FACA. In APHIS's motion to dismiss R-CALF's original pleading, APHIS pointed out that R-CALF had not pled sufficient facts to stablish that the ADT Working Group was a FACA advisory committee. In R-CALF's Amended Complaint, Petitioners abandoned their FACA claims relating to the State-Federal ADT Working Group and no longer allege that this entity is or was a FACA advisory committee. Doc. 27.

recommendation to put together a group of industry stakeholders in order to drive the ADT movement forward. AR 141; Doc. 47-4.   Various APHIS employees actively participated in the Denver meeting. Doc. 47-1, 47-2, 47-4 at pp. 3 & 27.

5.  The executive committee for the National Institute for Animal Agriculture (NIAA)[3] met on November 8, 2017 to form and name CTWG, and to discuss CTWG's membership. AR 385-87.  The group discussed government involvement and was advised by NIAA's Chief Operating Officer that an APHIS official only wanted "to be kept up to speed/informed, and … participate as needed." *Id.*   The NIAA executive committee decided that cost would be a shared responsibility among the participants. *Id.*  CTWG's goal was to advance ADT.  AR 5, 385, 466, 491, 927-929; Doc. 47-4, p. 25.

6.  CTWG first met on November 20, 2017. AR 491.  No APHIS officials attended. AR 5.  However, CTWG desired to work in parallel with APHIS efforts. *Id.* APHIS officials were invited to a CTWG meeting on April 8, 2019 to provide an update on current activities. AR 927-29.

7.  CTWG (and its various subgroups) met regularly.   Its purpose was "to work collaboratively across the various segments of the cattle industry to enhance the traceability of animals for purposes of protecting animal health and market access." AR 491.  In notes associated with CTWG, APHIS continued to envision moving forward with an EID system for effective traceability. AR 511. CTWG and APHIS

---

[3] NIAA is a nonprofit organization.  *See* https://www.animalagriculture.org.  R-CALF does not contend that NIAA is in any way a quasi-public organization such as the National Academy of Sciences.

worked closely together, and CTWG made frequent recommendations on ADT and EID technology. AR 795, 830-35, 867, 872-73, 884-87.

8. Internal dissension arose within CTWG, with some participants believing CTWG had served its purpose or reached a point of diminishing returns. AR 869, 879, 882, 915. 929, 957.  APHIS expressed a concern with how the dialogue would continue and an interest in an alternative to CTWG. AR 879.  One APHIS official observed, "I don't know what the next group might look like or how we pull them together but something we should consider.  It just wont [sic] be able to have NIAA/Katie Ambrose appearing as the helm." AR 901.

9. APHIS was advised that the "Producers Council" was "a spinoff" from the CTWG, and that this spinoff group would be announced at the April 8, 2019 NIAA Annual Conference.  AR 914-915, AR 869, 892, 1018-1021. The co-chairs of the Producers Council were cattle industry representatives who previously served on CTWG.  AR 915.  These co-chairs were tasked with putting together "a small, action oriented group with the singular goal of looking at the work [CTWG has] done, and the work yet to be done, uniquely through the eyes of the producers we all serve." *Id.*

10. The Producers Council (also referred to as the Producer Traceability Council (PTC)) first met on May 6-7, 2019. AR 921. An APHIS official attended the meeting and was asked to be identified as a "government liaison" and "non-voting member." AR 332, 921, 933.  NIAA commented to an APHIS official that the APHIS official underestimated her value to PTC as she was able to answer many questions that would have gone unanswered and slowed the process further. AR 945.  One or more

6

APHIS officials attended meetings with PTC. AR 968, 988, 1013, 1018. APHIS edited minutes for at least one meeting. AR 1061-63.

11. By press release dated May 15, 2019, the PTC announced it had reached consensus on two major points to increase the number of cattle identified in the United States. AR 948. One point was to select High Frequency/Ultra High Frequency radio identification system and timeline for adoption of the system to mirror the US Department of Agriculture's timeline for sunsetting of metal tags with complete implementation no later than January 1, 2023. *Id.*

12. Throughout 2018-19, CTWG and PTC sent APHIS a regular stream of RFID-related technical advice, approved by formal votes of those committees. AR 864-867 (CTWG); AR 335-36 (PTC).

<u>Discussion</u>

The Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 § 1, was enacted by Congress in 1972 based upon "a desire to assess" the need for the "numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." *Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 445–46 (1989) (citing 5 U.S.C. § 2(a)). The purpose of FACA is "to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public

remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature." *Public Citizen,* 491 U.S. at 446 (citing 5 U.S.C. § 2(b)).

An "advisory committee" is defined by FACA as "any committee, board, commission, council, conference, panel, task force, or other similar group" or subcommittee, which is "*established* or *utilized* " by the President, or by one or more agencies "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government," except a committee composed of wholly full-time, or permanent officers or employees of the Federal Government. 5 U.S.C. § 3 (emphasis added). FACA constrains the establishment of advisory committees in that such committees shall not be established unless specifically authorized by statute, by the President or by an agency head through an established procedure. 5 U.S.C. § 9(a).

FACA also imposes specific operational requirements on advisory committees such as: keeping detailed minutes of its meetings, § 10(c); requiring that those meetings be chaired or attended by an officer or employee of the Federal Government who is authorized to adjourn any meeting when such an adjournment is in the public interest, § 10(e); requiring the advisory committee to provide advance notice of meetings and that the meetings be open to the public, § 10(a); requiring that advisory committee minutes, records and reports be made available to the public, provided they do not fall within one of the Freedom of Information Act exceptions, and the Government does not choose to withhold them, § 10(b); and the advisory committees must be fairly balanced in terms of the points of view represented and the functions performed, §§ 5(b)(2),(c). *Public Citizen,* 491 U.S. at 446–47.

8

*A. Did APHIS "establish" CTWG or PTC for purposes of FACA?*

R-CALF argues the Administrative Record establishes as a matter of law that APHIS "established" CTWG and PTC in the interest of obtaining advice or recommendations and thus both are subject to FACA's requirements. According to R-CALF, both came into existence solely because of APHIS's stated policy goals and efforts to have an industry-led task force with government employee participation to develop a comprehensive plan related to the implementation of a fully integrated EID system. According to R-CALF, both committees then pursued the precise agenda dictated to them by APHIS. R-CALF argues *Public Citizen* did not interpret the meaning of "established" as that was not at issue, but that the Court referenced the Senate Report's explanation that the phrase "established or organized" should be construed broadly:

> Like the House Report, the accompanying Senate Report stated that the phrase "established or organized" was to be understood in its "*most liberal sense*, so that when an officer brings together a group **by formal or informal means**, by contract or other arrangement, and whether or not Federal money is expended, to obtain advice and information, such group is covered by the provisions of this bill."

*Id.* at 461 (citing S. Rep. No. 92-1098, p.8 (1972)) (bolded emphasis added).

The government argues for a narrow interpretation of FACA, and relies on out-of-circuit authority which has interpreted *Public Citizen* to conclude that an agency does not "establish" an advisory committee unless it directly or actually forms the committee. *See, Byrd v. U.S. Env'l Protection Agency*, 174 F.3d 239, 245 (D.C. Cir. 1999); *Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 736 F. Supp. 2d 24, 32-33 (D.D.C. 2010) (citing *Byrd*); *VoteVets Action Fund v. U.S. Dep't of Veterans Affairs*, 414 F. Supp. 3d 61, 68-71 (D.D.C. 2019). Thus, according to APHIS, it is not enough that an agency conceived of the need

for a committee.  Because APHIS did not select the membership of either group, was not

present at the organizational meeting of CTWG, was not involved in the "spinoff" of PTC

from CTWG, and took no action to directly or actually form either group, it did not

"establish" CTWG or PTC.

This Court starts with *Public Citizen* to derive the appropriate interpretation of

"established" as used in FACA.  While "established" may not be as "woolly" as "utilized,"

(*Public Citizen,* 491 U.S. at 452), *Public Citizen* instructs against a literalistic meaning of

5 U.S.C. § 3(2).  *Id.* at 463-64.   Therefore, this Court will consider evidence of

congressional intent to lend the term "established" its proper scope.  After all, the Supreme

Court instructed that "[c]lose attention to FACA's history is helpful, for FACA did not

flare on the legislative scene with the suddenness of a meteor." *Id.* at 455.  In its analysis

of FACA's history, the Court found Executive Order No. 11007, 3 CFR 573 (1959-1963

Comp.) particularly useful:

> President Kennedy issued Executive Order No. 11007 . . . which governed the
> functioning of advisory committees until FACA's passage. Executive Order No.
> 11007 is the probable source of the term "utilize" as later employed in FACA. The
> Order applied to advisory committees **"formed by a department or agency** of the
> Government in the interest of obtaining advice or recommendations," or "not
> formed by a department or agency, but only during any period when it is being
> *utilized* by a department or agency in the same manner as a Government-formed
> advisory committee." § 2(a) (emphasis added). To a large extent, FACA adopted
> wholesale the provisions of Executive Order No. 11007.

*Id.* at 456-457 (bolded emphasis added).  The Court then concluded that FACA's legislative

purpose "could be accomplished, however, without expanding the coverage of Executive

Order No. 11007 to include privately organized committees that received no federal funds."

*Id.* at 459.  Further, in considering the term "utilized" by an agency, the Court contrasted

the term "established" in the following way:

> This inference [that Executive Order No. 11007 did not encompass the ABA
> Committee] draws support from the earlier House Report which instigated the
> legislative efforts that culminated in FACA.  That Report complained that
> committees "utilized" by an agency – as opposed to **those established directly by
> an agency** – rarely complied with the requirements of Executive Order No. 1107.
> See H.R. Rep. No. 91-1731, supra, at 15. . . . There is no indication in the Report
> that a purely private group like the APA Committee that was not **formed by** the
> Executive, accepted no public funds, and assisted the Executive in performing a
> constitutionally specified task committed to the Executive was within the terms of
> Executive Order No. 11007 or was the type of advisory entity that the legislation
> was urgently needed to address.

*Id.* at 460 (emphasis added).

The Supreme Court then shifted its focus to the Senate bill which "grew into

FACA." *Id.* at 461.

> Like the House Report, the accompanying Senate Report stated that the phrase
> "established or organized" was to be understood in its "most liberal sense, so that
> when an officer brings together a group by formal or informal means, by contract
> or other arrangement, and whether or not Federal money is expended, to obtain
> advice and information, such group is covered by the provisions of this bill." S.Rep.
> No. 92–1098, *supra,* at 8. While the Report manifested a clear intent not to restrict
> FACA's coverage to advisory committees funded by the Federal Government, it did
> not indicate any desire to bring all private advisory committees within FACA's
> terms.

*Id.*  Then, in explaining its conclusion in the last sentence, the Supreme Court referenced

"groups organized by, or closely tied to, the Federal Government, and thus enjoying quasi-

public status." *Id.*

The Supreme Court then turned to the complete phrase, "established or utilized:"

> It is true that the final version of FACA approved by both Houses employed the
> phrase "established or utilized," and that this phrase is more capacious than the word
> "established" or the phrase "established or organized." But its genesis suggests that

11

it was not intended to go much beyond those narrower formulations. . . .  In the section dealing with FACA's range of application, the Conference Report stated: "The Act does not apply to persons or organizations which have contractual relationships with Federal agencies *nor to advisory committees not directly established by or for such agencies.*" *Id.*, at 10 (emphasis added). The phrase "or utilized" therefore appears to have been added simply to clarify that FACA applies to advisory committees established by the Federal Government in a generous sense of that term, encompassing groups formed indirectly by quasi-public organizations such as the National Academy of Sciences "for" public agencies as well as "by" such agencies themselves.

*Id.* at 461-462 (emphasis in original).  Finally, in explaining the proper interpretation of "utilized," the Supreme Court stated, "[a]nd it comports well with the initial House and Senate bills' limited extension to advisory groups 'established,' on a broad understanding of that word, by the Federal Government, whether those groups were established by the Executive Branch or by statute or whether they were the offspring of some organization created or permeated by the Federal Government." *Id.* at 463.

From *Public Citizen*, this Court concludes that the term "established" should not be read beyond a narrower formulation consistent with Executive Order No. 11007 with the limited expansions[4] recognized by the Supreme Court.  Thus, a group which is not <u>directly formed by</u> a government agency (or by a quasi-public organization such as the National Academy of Sciences for a government agency) is not a committee "established" by the government within FACA's terms.  Further, in several comments from *Public Citizen*, the Supreme Court also placed some significance on funding by the government (with the exception of quasi-public entities).

---

[4] These expansions are not applicable in this case.

Applying these conclusions to the facts derived from the Administrative Record, it seems clear that APHIS wanted, needed, envisioned and recommended the creation of an industry-led group (like CTWG and PTC) to work in furtherance of APHIS's objective to improve the effectiveness of the ADT program and move toward an EID system for cattle consistent with APHIS's targeted implementation date of January 1, 2023. APHIS also worked with both entities, and corrected work product produced by the entities.  However, notwithstanding R-CALF's arguments to the contrary, there is no evidence to suggest that either group was directly formed by APHIS.  More specifically, it is not persuasive to find that APHIS directly formed CTWG at the September 2017 Strategy Forum on Livestock Traceability.  APHIS presented slides at the 2017 Traceability Forum, and CTWG was formed "as an outcome of" that Forum. AR 5.  But it was not directly formed by APHIS at or after that Forum.  Rather, it was formed by and composed of industry leaders, as was PTC. *Id.*; AR 331-32, 921.

Further, while R-CALF argues that APHIS officials were members of CTWG and PTC, that fact is not established.  Considering the totality of the Administrative Record, the Court finds that APHIS was not a member of either group, but rather it functioned to provide input and to help focus the groups, as well as a resource for the groups. Notwithstanding whether either group was purely private, there is no dispute that neither group was funded by APHIS. There is also no dispute that both groups were led by industry representatives and both were comprised (if not in total, then by a vast majority) of industry representatives.

In summary, considering the term "established" and applying a narrower rather than literalistic interpretation, the Court concludes APHIS did not establish either CTWG or PTC for the purposes or application of FACA.

### B. Did APHIS "utilize" CTWG or PTC for purposes of FACA?

Turning again to *Public Citizen,* an agency "utilizes" a group, as that term is used in FACA, only if the group is "amenable to . . . strict management by agency officials." *Public Citizen*, 491 U.S. at 457-58.   This is also reflected in federal regulations, which state:

> Utilized for purposes of [FACA], does not have its ordinary meaning.  A committee that is not established by the Federal Government is utilized within the meaning of [FACA] when the President or a Federal office or agency exercises actual management or control over its operation.

41 C.F.R. § 102-3.25.

As noted above, the Administrative Record demonstrates only that CTWG and PTC were advancing the same objective as APHIS in support of an effective ADT program, and they were operating for the most part on parallel tracks with APHIS.  APHIS participated in certain meetings to provide input and help focus the groups, and edited the work product of the groups.  However, nothing in the Administrative Record supports the conclusion that APHIS exercised actual management or control over the operations of either CTWG or PTC.  Given this, the Court concludes APHIS did not utilize either CTWG or PTC for the purposes or application of FACA.

Conclusion

For the foregoing reasons, the Court has completed the agency record as requested by R-CALF, and will consider the documents supplied by R-CALF as part of the agency record. *See* Doc. 47-1, 47-2, 47-3, 47-4, 47-6, 52-1, 62-1, 62-2, 62-3, 62-4 & 62-5.  The Court further concludes that CTWG and PTC are not subject to FACA.  Based on this conclusion, there is no violation of the Administrative Procedure Act and no injunction is appropriate.

Therefore, it is HEREBY ORDERED that

Plaintiff's  Supplemental  Motion  for  Completion  of  Record  (Doc.  52)  is GRANTED; and

Plaintiff's Second Supplemental Motion for Completion of Record (Doc. 62) is GRANTED; and

Plaintiff's Amended Complaint for Violation of the Federal Advisory Committee Act (Doc. 27) is DISMISSED WITH PREJUDICE.

Judgement shall enter for the Defendants.

Dated this 13th day of May, 2021.

NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE

15